# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4623 | **DATE** | 2/27/2004 |
| **CASE TITLE** | J. N. Moser Trucking, Inc., etc. vs. U.S. Dept. of Labor | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due _____. Reply to answer brief due _____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]    Enter Memorandum Opinion and Order.   After reviewing the parties' submissions and the administrative record, this Court grants Moser's motion for summary judgment (7-1) and denies Department's motion. (5-1) This Court therefore vacates Department's final order pursuant to Sections 706 and 39 and remands this case to Department. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | FEB 2 7 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 20 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 2/27/2004 | | |
| | | | date mailed notice | | |
| | SN | courtroom deputy's initials | SN | | |
| | | | mailing deputy initials | | |
| | | Date/time received in central Clerk's Office | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

J.N. MOSER TRUCKING, INC., etc., )
et al., )
)
)
Plaintiffs, )
)
v. )    No. 03 C 4623
)
UNITED STATES DEPARTMENT OF LABOR, )
et al., )
)
Defendants. )

DOCKETED

FEB 2 7 2004

<u>MEMORANDUM OPINION AND ORDER</u>

J.N. Moser Trucking, Inc. and Donald and Kristy Schleining
(collectively "Moser")[1] sue under the Administrative Procedure
Act ("APA," 5 U.S.C. §§701-706) and the Declaratory Judgment Act
(28 U.S.C. §2201) to challenge the finding of the Department of
Labor ("Department") that Moser violated the McNamara-O'Hara
Service Contract Act of 1965 ("Service Contract Act" or "Act," 41
U.S.C. §§351-358).[2] Department had determined on appeal after an
administrative hearing that Moser violated the Act by failing to
pay its drivers for "bobtail time": the time it took drivers to
transport empty tractors[3] between Moser's terminal and various
postal facilities at the beginning and end of the drivers'

---

[1] For convenience and not out of disrespect or undue
familiarity, the Schleinings will be referred to here as "Donald"
and "Kristy."

[2] Citations to both the APA and the Act take the form
"Section--," omitting the Title 5 and Title 41 references. No
confusion should result from that dual usage because the section
numbers are so different.

[3] "Tractors" are trucks that Moser used to haul mail.



shifts. Moser asks this Court to set aside Department's determination as clearly erroneous and not in accordance with the law.

Both sides have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 or, in the alternative, for judgment under Rule 52.[4] After reviewing the parties' submissions and the administrative record, this Court grants Moser's motion for summary judgment and denies Department's motion.

Summary Judgment Considerations

Although both sides have filed this District Court's LR 56.1 statements and responses, Department's response is wholly deficient. It failed to include any references to specific supporting material, and in some instances it simply responded that certain asserted facts are "irrelevant" or that it lacked "sufficient knowledge or information to form a belief as to the truth of the allegations asserted." Those responses are entirely unacceptable and do not comport either with the express language of LR 56.1(b)(3) or with its intended purpose. As Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003)(citations and internal quotation marks omitted) makes plain:

---

[4] That Rule 52 alternative was included at this Court's suggestion because of the possibility that the Janus-like perspectives required on cross-motions for summary judgment could result in a dry run if this Court were to perceive the existence of a genuine issue of material fact where the parties had not, thus forcing the denial of both motions. That possibility has not eventuated, though.

2

A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed issue of fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. In short, judges are not like pigs, hunting for truffles buried in briefs.

It is true that Department filed its own LR 56.1(a)(3) statement that identified portions of the record to support its factual assertions, but that fulfilled only half of its responsibility under LR 56.1. Because Department's response is so deficient, this Court would have the power to strike its LR 56.1(b)(3) response in its entirety and accept Moser's statements of fact as true--a ruling that would effectively resolve Moser's motion for summary judgment in its favor (<u>Bordelon v. Chicago Sch. Reform Bd. of Trs.</u>, 233 F.3d 524, 527-28 (7th Cir. 2000)). That drastic step is unnecessary, however, for this Court determines that Moser prevails on the merits in any event.

<u>Background</u>[5]

Moser's only business is hauling mail for the United States Postal Service ("Service"). Moser's Illinois terminal[6] is

_____

[5] Most of this factual recital is culled from the parties' submissions and the administrative record and is not in dispute. This opinion cites to the trial transcript ("Tr.") or the administrative record ("R.") where relevant. This opinion also cites to the decision and order of Administrative Law Judge ("ALJ") Daniel Roketenetz as "ALJ Order" and to the final decision and order of the Administrative Review Board ("ARB") as "ARB Order," in each case referring to their internal page numbers, not to their location in the administrative record.

[6] Moser also has a Florida office, but none of the alleged Service Contract Act violations occurred at that location.

3

located in Montgomery and services postal facilities throughout the Chicagoland area. Kristy (the daughter of now-retired company founder John Moser) and Don (Kristy's husband) manage Moser's Illinois operation. Moser employs approximately 140 workers, most of whom live within six miles of the Montgomery terminal.

From September 1993 to March 1994 Gerald Becker ("Becker"), an investigator with Department's Wage and Hour Division, conducted an audit and investigation to determine whether Moser had complied with all the provisions of the Service Contract Act. As a result of Becker's investigation, Department filed an administrative complaint on March 28, 1995 alleging that Moser committed numerous violations of the Act between 1992 and 1993, including a charge that Moser should have paid its drivers for bobtail time. Next the parties conducted discovery and, before submitting the case to an ALJ for a hearing and determination, settled all contested issues except whether the drivers should have been compensated for bobtail time and if so, whether Moser should be barred from bidding on government contracts as provided by Section 354(a)(R. 1270-75). In a stipulation between the parties, Moser admitted that it did not pay its drivers for bobtail time and that the unpaid time amounted to $900,584 including pre- and post-trip inspections (R. 581-90, 1270-75; ALJ Order 7-8; ARB Order 3).

To challenge Department's contention that bobtail time was compensable under the postal contracts, Moser sought to demonstrate at the administrative hearing that drivers were not required to pick up their tractors at the Montgomery terminal. Instead they were also given the option of traveling directly from their homes to the postal facilities where they would begin their routes. Moser claims that bobtailing was actually more expensive for Moser than leaving the tractors parked at the postal facilities at the end of each shift would be, but it asserts that it permitted the practice as a perk for its workers, seeing that most of them lived near the Montgomery facility and did not want to incur the wear and tear on their own personal vehicles (some of the postal facilities were over 40 miles away). According to Moser, some drivers did not go to the Montgomery facility at the beginning of their normal work day--rather they took tractors home with them and drove directly to the postal facilities at the beginning of their shifts, then back home again after their shifts ended.

Department sought to prove that Moser's drivers never had any such option. In its view each driver had to pick up a tractor at the Montgomery terminal every morning, making the bobtail time an integral and indispensable part of the drivers' duties under the postal contracts. So, according to Department, those drivers should have been compensated for that time.

Department contended (1) that Moser did not have any place to keep its tractors near most of the postal facilities, so the drivers could not have started there, and (2) that even if they could have done so, Moser never told its employees of that option. As for driving tractors to and from home, Department claims that few workers were ever permitted to do so on a regular basis and that in any event that practice does not bear on whether bobtail time should be compensable.

During the formal hearing before the ALJ, which lasted from March 16 through 19, 1999, Department called as witnesses several people who drove for Moser during 1992-93 in addition to the dispatcher for Moser at that time and Department's investigator Becker, while Moser called several drivers as well as Kristy and Donald. Three of Moser's employees--one of whom was called by Department--testified that Moser did offer them the choice of driving directly to the postal facility rather than picking up a tractor at the Moser terminal: Dale Augustine ("Augustine"), Tr. 48; George Nilo ("Nilo"), Tr. 798 and Robert Allgood, Tr. 821. Several witnesses for both sides also testified that some drivers could take their assigned tractor home with them on a regular basis: Augustine, Tr. 41-47, 52-58; Angel Hernandez, Tr. 186; Kristy, Tr. 577-78, 583, 600; Donald, Tr. 646-47; Nilo, Tr. 804, 820. But some drivers testified that they were not given either option: Junior Smith, Tr. 145; Patrick Hamilton ("Hamilton"),

Tr. 330 and Jerry Nelson ("Nelson"), Tr. 352.

Donald testified that he spoke with his drivers and that they preferred to pick up tractors at the Moser terminal rather than drive directly to the postal facilities in their personal vehicles (Tr. 650-51). He also testified that parking was available at some of the postal facilities (the Bulk Mail Center, Fox Valley and St. Charles) but not at the Palatine or Carol Stream facilities (Tr. 650). But in that respect Donald testified both that he could have obtained parking and that it would have been less expensive for Moser to keep the tractors near the postal facilities than to permit the drivers to bobtail every day (Tr. 653-66). Kristy also testified that parking was available at several postal facilities (she identified South Suburban, Rock Island and Fox Valley) but not at the Palatine and Carol Stream facilities (Tr. 578-79).

On December 1, 2000 the ALJ issued his order, concluding that the evidence did not support Department's contention that Moser directed its drivers to bobtail or that the practice was for Moser's convenience (ALJ Order 9). On that score the ALJ stated (id.):

> Rather than requiring its drivers to prick up a truck at a particular location, Moser offered its drivers the option of picking up a truck at its terminal or driving their own vehicles to or near the first postal facility where a truck could be parked waiting for them.

In reaching that factual conclusion the ALJ specifically

7

relied on the testimony from Donald, Augustine and Nilo and
expressly discounted the testimony from Hamilton and Nelson
because they were seasonal employees who were less familiar with
Moser's business practice (id. n.5) and because Nelson appeared
biased against Moser--he testified that he thought the
Schleinings are "liars and thieves" (Nelson, Tr. 359; ALJ Order 9
n.5). ALJ Roketenetz also found that "a significant number of
Moser drivers were allowed to take their assigned trucks home and
did so on a regular basis," although the exact number of drivers
who did so and how often could not be determined from the record
(ALJ Order 4). Because he found that the drivers had choices
other than bobtailing, the ALJ determined that "it can only be
concluded that the drivers were acting for their own convenience
and not under Moser's direction," so that bobtailing was not
compensable (id. 9).[7]

Department sought review of the ALJ's decision, and on
May 30, 2003 the ARB reversed in a final decision and order (ARB

---

[7] ALJ Roketenetz ruled adversely to Moser on one issue,
concluding that it failed to pay for the time required to connect
a trailer to its tractor and to perform a thorough inspection
while at the postal facilities (ALJ Order 10-11). Nevertheless
the ALJ concluded after a detailed analysis that unusual
circumstances existed to relieve Moser from debarment under
Section 354(a) (id. 11-16). Then in a January 5, 2001
Supplemental Decision and Order the ALJ ordered Moser to pay
$71,482.84 for inspection and hook-up time at the postal
facilities (R. 3241-42).

Order 13).[8] That decision rejected, as assertedly unsupported by a preponderance of the evidence, the ALJ's finding that drivers had other options beside driving directly to the Montgomery terminal and then on to the postal facilities (id. 5). In part the ARB found the Schleinings' testimony "very unreliable" because Donald and Kristy made "materially inconsistent" statements about the postal facilities where parking was available (id. 4). It also relied on the testimony of the couple of drivers who claimed they were never told about driving directly to the postal facilities where a tractor would be waiting for them (id.), and it rejected as "mostly equivocal" the testimony of the several witnesses who testified otherwise (id. 5).

As to whether some drivers brought their tractors home and drove directly to the postal facilities, the ARB stated that the record was unclear that such a practice was significant during 1992-93 and also decided that the practice was irrelevant anyway because it did not constitute "bobtailing" (ARB Order 10 n.39). In sum, the ARB concluded that because bobtailing was "the only way most of the drivers could begin to carry out their daily mail hauling duties in 1992-93" (id. 10, emphasis in original), it was a compensable activity under the Fair Labor Standards Act

---

[8] But the ARB affirmed the ALJ's decision rejecting debarment because Department did not press that issue on appeal (ARB Order 13).

("FLSA"). That ARB ruling constitutes the final agency decision (see 29 C.F.R. §2.8), and Moser filed this action on July 3, 2003 to seek review of that order.

Standard of Review

Although this opinion is triggered by Rule 56 motions, the judicial review of an agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding. Section 706 sets out the standards that courts must follow when reviewing federal agency action unless another statute clearly requires otherwise (Dickinson v. Zurko, 527 U.S. 150, 154-55 (1999); 5 U.S.C. §559). Under Section 706 "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," though "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer" (Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)). Agency findings of fact made on the record after a hearing must be set aside if "unsupported by substantial evidence" (Section 706(2)(E); Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 377 (1998)). Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001)(internal quotation marks omitted) explains how the APA's "substantial evidence" standard is extremely deferential to the

10

final agency determination:

> Substantial evidence, although more than a mere scintilla of proof, is no more than such relevant evidence as a reasonable mind might accept to support a conclusion.

But by definition that is a principle generally applicable to administrative review, while the more specific enforcement provision of the Service Contract Act (Section 353(a)) plainly demands a different standard of review--although it leaves unclear just what that standard is. Section 353(a) incorporates 41 U.S.C. §39 by reference, and that statute in turn says that agency "findings of fact after notice and hearing...shall be conclusive on all agencies of the United States, and if supported by the preponderance of the evidence, shall be conclusive in any court of the United States...."[9] Undoubtedly that language requires a court to find something more than substantial evidence to sustain the agency's findings of fact--but the precise standard that Congress intended is obscured by a poor choice of phrase, for "preponderance of the evidence" customarily sets a standard of proof and not a standard of review (Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993)).

---

[9] Because the actual statutory language appears in 41 U.S.C. §39 rather than in the Act itself, the analysis that follows in the text refers only to that provision (with some apology, though again the very different number should avoid any confusion, cited simply as "Section 39"). But that is done with the understanding that it is the proper construction of the Act's Section 353(a) that is at issue here.

Conventional wisdom teaches that preponderance of the evidence as a standard of proof requires that the party who bears the burden prove that a proposition is more likely true than not true (United States v. Breland, ___ F.3d ___, No. 03-1691, 2004 WL 178087, at *5 (7th Cir. Jan. 30)). If that were literally carried forward as a standard of review, the phrase "preponderance of the evidence" would suggest that a court should reevaluate the evidence de novo and reject the agency's findings if the court were to determine independently that those findings are not supported by the weight of the evidence.

But that reading does not jibe with the rest of the statutory language. If such a de novo determination were really what the statute required, it would then be the court's own findings that the statute would make "conclusive in any court of the United States"--including that court itself. No conclusiveness would attach to the agency's finding as such--a bizarre result that would afford no deference at all to the agency's conclusions. Moreover, a court cannot fairly review an agency's credibility determinations de novo without observing the witnesses itself--yet nothing in the Service Contract Act (or in the APA, for that matter) gives the court authority to conduct a new hearing in this case (American Waste Removal Co. v. Donovan, 748 F.2d 1406, 1408 (10th Cir. 1984); Camp v. Pitts, 411 U.S. 138, 141-42 (1973)(per curiam); United States v. Carlo Bianchi &

Co., 373 U.S. 709, 714-15 (1963)). And "in the absence of specific statutory authorization, a de novo review is generally not to be presumed" (Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619 n.17 (1966)).

Moser Mem. 10 argues that this Court should follow the First Circuit's opinion in Dantran, Inc. v. United States Dep't of Labor, 171 F.3d 58, 70-71 (1st Cir. 1999) by adopting a "clearly erroneous" standard of review for an agency's findings of fact under the Service Contract Act.[10] Dantran, id. at 70 observed that the statute's use of "preponderance of the evidence" was "at best an awkward locution, for it connotes nothing about the degree of probability of error required before a reviewing court may set aside a factual determination." Dantran, id. held that something other than de novo review must have been intended, because "[i]f an appellate tribunal were to apply the preponderance of the evidence standard literally, it would mire

_____

[10]    Moser appears to be operating under the mistaken impression that the clearly erroneous standard is more deferential than the substantial evidence standard (Moser Mem. 9).  On the contrary, the clearly erroneous standard has long been recognized to demand closer judicial scrutiny than the substantial evidence standard.  As Robert L. Stern concluded in his landmark article Review of Findings of Administrators, Judges and Juries: A Comparative Analysis (hereafter Administrators, Judges and Juries), 58 Harv. L. Rev. 70, 88-89 (1944):

Policy, authority and history all thus show that the "clearly erroneous" rule gives the reviewing court broader powers than the "substantial evidence" formula.

See also Dickinson v. Zurko, 527 U.S. 150, 153 (1999).

itself in a factfinding exercise inconsistent with the accepted appellate role."

*Dantran* settled on a clearly erroneous standard in large part because the court found that the Act's language was similar to that in 29 U.S.C. §1401(c), part of the Multiemployer Pension Plan Amendments Act of 1980, where Congress specifies that "there shall be a presumption, rebuttable only by a <u>clear preponderance of the evidence</u>, that the findings of fact made by the arbitrator were correct" (emphasis added). *Dantran*, 171 F.3d at 70 first noted that two cases from our own Court of Appeals had construed that "clear preponderance" language, when used in the standard-of-review context, operated in much the same way as a clearly erroneous standard, and *Dantran* then concluded that the language of the Act called for the same approach. *Dantran*, <u>id</u>. at 71 also observed that under a clearly erroneous standard any administrative reviews under the Act would have "a certain symmetry" with the review that appellate courts conduct when evaluating district court factfinding that has been carried out pursuant to a preponderance of the evidence burden of proof (see Rule 52(a)).

Although this Court is not persuaded by the analogies invoked in *Dantran* to reach the just-stated result, it too ultimately agrees--albeit for different reasons--that Section 39 (and hence Section 353(a)) imposes a clearly erroneous standard

of review.  But before those different reasons are addressed,
some explanation of the difficulties posed by the <u>Dantran</u>
analysis may be in order.

First, contrary to what <u>Dantran</u> suggests, it is not outside
a district court's traditional role to review an agency's
findings of fact independently, and indeed courts do it all the
time.  Title VII and ADEA provide two ready examples where courts
conduct de novo review of administrative proceedings (<u>Chandler v.
Roudebush</u>, 425 U.S. 840, 861-62 (1976); 42 U.S.C. §2000e-16(c);
29 U.S.C. §626(c) and (d)).  And while symmetry may have a
certain aesthetic appeal in surface terms, it does not furnish a
sound basis to favor the "clearly erroneous" standard over any
other when the APA's default standards do not apply.  Under
ordinary standards of review trial court findings are treated
differently than agency findings (contrast Section 706 with Rule
52(a)),[11] so why should it be presumed that when Congress changes
those rules it must have intended the two to be treated the same?
If the standards do turn out to coincide, it may only be because
there is a limited number of standards from which to choose.

As for the Multiemployer Pension Plan Amendments Act, this
Court is not persuaded that it provides a suitable comparison to
Section 39.  Judge Cudahy of our own Court of Appeals (sitting

---

[11]   For an excellent discussion of the difference between
clearly erroneous and substantial evidence review and the reasons
why agency findings should ordinarily be afforded greater
deference, see Stern, <u>Administrators, Judges and Juries</u> at 80-89.

with the First Circuit by designation in the Dantran case)
observed in dissent that the statute relied on by the panel
majority frames the standard of review more conventionally as a
presumption in favor of the factfinder--a presumption that may be
overcome only by a "clear preponderance of the evidence" (171
F.3d at 77, quoting 29 U.S.C. §1401(c)). By contrast, Section 39
does not by it terms adopt a presumption of correctness, but
instead requires the reviewing court to determine on its own
whether the agency's findings are supported by the preponderance
of the evidence before those findings are to be given any effect.
Besides, if the presence of the word "clear" in "clear
preponderance of the evidence" is to be given any effect, it
would appear to set that standard apart from the "mere"
preponderance review that is called for here.

But as stated earlier, quite apart from Dantran this Court
reaches the conclusion that the clearly erroneous standard should
apply here by looking to a different analogy: the reading that
our Court of Appeals has given to the review provision in the
Individuals with Disabilities in Education Act ("IDEA," 20 U.S.C.
§1415(i)(2)), which contains language nearly identical to the
statute at issue here. IDEA (emphasis added, and citations to
subparts omitted) permits "[a]ny party aggrieved by the findings
and decision" of a state administrative agency to bring an action
in a district court, which "shall receive the records of the

16

administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 175, 205 (1982) rejected the contention that the just-quoted review provision intended to limit appellate review severely. But Rowley, id. at 206 also cautioned that the provision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review" and found that the provision "carries with it the implied requirement that due weight shall be given" to the agency's proceedings.

It is true that most circuits have understood Rowley to adopt a "modified de novo" standard of review, under which courts are required to make an independent evaluation of the record below while giving "due weight" to the agency proceedings, particularly on issues of credibility and policy (see, e.g., S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001); Erickson v. Albuquerque Pub. Schs., 199 F.3d 1116, 1120 (10th Cir. 1999)). But the appellate court whose decisions control this Court's opinions has taken a quite different approach. Dale M. ex rel. Alice M. v. Board of

Education of Bradley-Bourbonnais High School District No. 307,

237 F.3d 813, 815 (7th Cir. 2001) explains:

> [W]hen the district court does not take fresh evidence but
> instead bases his review of the hearing officer's decision
> on the record compiled in the administrative proceedings, he
> is required to give "due deference" to that decision. That
> is, the fact that he disagrees with the officer is not
> enough to justify setting aside the latter's order; he must
> be strongly convinced that the order is erroneous.

This Court does not of course write on a clean slate. It is
not free, for example, to apply a stricter standard of review
akin to the "modified de novo" standard described by other Courts
of Appeals. Even though the Seventh Circuit has never had
occasion to construe Section 39 directly, the IDEA review
provision is so similar in language (with no readily apparent
basis for distinction) that this Court is constrained to apply
the clearly erroneous standard expounded in Dale (see also
Heather S. by Kathy S. v. Wis., 125 F.3d 1045, 1053 (7th Cir.
1997)). In sum, then, the agency's factual findings must be
upheld unless this Court is strongly convinced that they were
wrong.[12]

### What of the Merits?

According to Sections 351(a)(1) and 351(b)(1), every
contractor that enters into a service contract with the federal
government in an amount over $2,500 must pay minimum wages and

---

[12] Because the ensuing analysis reveals that reversal is
called for in those terms, any other standard that would specify
closer scrutiny than a clearly erroneous review would necessarily
compel the same conclusion.

provide certain fringe benefits to its workers as specified in the FLSA (29 U.S.C. §§201-206). Section 254(a)(the Portal-to-Portal Act) provides that employers need not compensate employees for these activities unless an express contract or custom or practice provides otherwise:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> (2) activities which are preliminary to or postliminary to said principal activity or activities....

Dunlop v. City Electric, Inc., 527 F.2d 394, 398-99 (5th Cir. 1976) (citations and internal quotation marks and brackets omitted) sets out the test that most courts have adopted for determining when activities are not compensable under the Portal-to-Portal Act:

> The activities must be undertaken for the employees' own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer. The exemption was not intended to relieve employers from liability for any work of consequence performed for an employer from which the company derives significant benefit. Nor was the exemption to apply to work performed before or after the regular work shift as an integral and indispensable part of the principal activities for which covered workmen are employed.

Here the ARB rejected the ALJ's decision in part because it found that the ALJ had applied a narrow sort of "benefits test" to determine whether bobtailing was compensable (ARB Order 6). But that is not an accurate characterization of the ALJ's ruling. Although the ALJ did say that "Moser receives no benefit of

19

consequence" from bobtailing (ALJ Order 10), he also held that "Moser would be required to compensate its drivers for bobtail driving if the activity was performed for Moser's convenience or at Moser's direction" (id. 9) and, having done so, then concluded that Moser neither (1) required its drivers to bobtail nor (2) benefitted economically from the practice, because it may actually have cost less for Moser to maintain parking at the postal facilities. Hence the ALJ properly relied on Dunlop and considered the factors it highlighted in determining whether bobtailing was compensable.

Nor does Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721 (5th Cir. 1961) change the analysis, despite the ARB's suggestion to that effect. Mitchell Truck Line merely found under its facts that certain activities were integral and indispensable to the principal activities performed, while the ALJ here found the opposite: that bobtailing was not integral and indispensable to Moser's principal activity of hauling mail. Rather than supplying a different legal standard, Mitchell Truck Line simply faced and dealt with an entirely different factual scenario, and the ALJ properly understood and applied the appropriate standards.

As for the ARB's review of the ALJ's factual findings on bobtailing, Department's own regulations permit the ARB to "modify or set aside findings of fact only when it determines

that those findings are not supported by a preponderance of the evidence" (29 C.F.R. §8.9).  Again that "preponderance" phrase rears its nasty head!  However the agency may reasonably choose to interpret that language,[13] it clearly does not give the ARB, as the agency's appellate body, free rein to substitute its own credibility determinations in place of the hearing officer's, at least in the manner that was employed here.

This Court must of course review the final agency decision-- and not the ALJ's determination--when determining whether the agency clearly erred, and it must afford that final agency decision "due deference" if the appellate board disagrees for good and sufficient reasons with the factual findings of the hearing officer (Heather S., 125 F.3d at 1053). As Carlisle Area School v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995)(emphasis added) explains:

> Given our decision about the appeals panel's scope of review, we conclude that a district court should still give

---

[13]  Section 39 does not prescribe a standard of review that Department must apply to its own hearing officer.  Indeed, it does not even require an internal appellate review.  Moser suggests that no such review should be allowed under that statute because of its clause stating the ALJ's findings "shall be conclusive upon all agencies of the United States."  But nothing in the statute prohibits the Secretary of Labor's establishment of a two-tiered procedure such as the one currently in place, and nothing prohibits the second tier body from using a "preponderance" standard of review of the first tier's (ALJ's) decision.  And as the earlier discussion in the standard-of-review section demonstrates, that phrase is sufficiently ambiguous so that an agency may adopt a reasonable construction of that language and courts are required to defer to that interpretation (Chevron, 467 U.S. at 844).

"due weight" to the appeals panel's decision when it
reverses the hearing officer's conclusions of law,
inferences from proven facts, and factual findings based on
credibility judgments where non-testimonial, extrinsic
evidence justified the appeals panel's contrary decision.

But that does not call for such deference where the
appellate board's sole basis for reversing the hearing officer is
instead because it has simply come to a different conclusion as
to the credibility of witnesses (persons whom it has neither seen
nor heard) in the absence of such other evidentiary support.
General Dynamics Corp. v. Occupational Safety and Health Review
Comm'n, 599 F.2d 453, 463 (1st Cir. 1979) puts it this way:

> The credibility findings of the person who sees and hears
> the witnesses--be he ALJ, jury, or judge--is entitled to
> considerable deference. While the degree of deference due
> the ALJ's final decision is related to the importance of
> credibility in a particular case, the ALJ's decision to give
> or deny credit to a particular witness' testimony should not
> be reversed absent an adequate explanation of the grounds
> for the reviewing body's source of disagreement with the
> ALJ.

For precisely that reason this Court finds that the ARB's
decision regarding the compensability of bobtail time was clearly
erroneous, because the ARB surely did not adequately justify its
refusal to accept the ALJ's findings. Without seeing or hearing
the Schleinings (or, for that matter, any other witness), the ARB
rejected the Schleinings' testimony as "very unreliable" (ARB
Order 4) even in the face of the decision by the ALJ (who after
all conducted the in-person hearing) that he was entitled to rely
on their testimony in several key respects. It was flat-out

wrong to label Donald's and Kristy's testimony as "materially inconsistent," as the ARB did. Instead the Schleinings simply identified different postal facilities that had parking availability, and both of them identified the Carol Stream and Palatine facilities when they were asked where no parking was available. No record justification existed for the ARB to toss out the Schleinings' vital testimony from consideration on the bobtail time issue.

Nor, by the same token, did the ARB explain any reasonable basis at all for adopting the testimony of drivers Hamilton and Nelson, whose testimony the ALJ had expressly discounted on the legitimate grounds that they were seasonal employees with a substantially lesser basis for the opinions they expressed and, in one instance, had displayed a clear bias against the Schleinings. Yet the ARB paid that adverse evaluation by the ALJ, though firmly rooted in the evidence, no heed. And on the obverse side of the credibility coin, the ARB wrongly concluded that substantial other testimony that directly supported Moser's claim that its drivers had several options besides bobtailing was "equivocal"--a plain mischaracterization, for several drivers testified without ambiguity that Moser offered them a choice to drive directly to and from the postal facilities each day. There was nothing equivocal about that evidence, yet the ARB unfairly rejected it on that false premise.

In sum, the ARB distorted its proper role as a reviewing body by substituting its credibility judgments for those of the ALJ, who had identified entirely reasonable bases for his own evaluations, and by otherwise flouting the standards for its appellate review. No reason appears why those standards, properly applied, should not have triggered affirmance of the ALJ's decision.

## Conclusion

There is indeed no genuine issue of material fact here, as both sides believed when they filed their cross-motions for summary judgment. Based on a review of the record as a whole, and after taking into consideration the important factor-- disregarded by the ARB--that the ALJ was in the unique position of assessing the credibility of witnesses who testified on the bobtail issue, this Court concludes that the ARB clearly erred when it determined that bobtail time under the circumstances of this case is compensable under the FSLA. This Court therefore vacates Department's final order pursuant to Sections 706 and 39 and remands this case to Department.

Although it would seem a near certainty that "remand will amount to no more than an empty exercise" (as Circuit Judge Selya put it in the majority opinion in <u>Dantran</u>, 171 F.3d at 73), this Court will opt for the more cautious course marked out by <u>Florida</u>

<u>Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).[14]

Needless to say, Department is expected to proceed on remand in accordance with this opinion.[15]

<em>[signature]</em>

Milton I. Shadur
Senior United States District Judge

Date: February 27, 2004

---

[14] In analytical terms it would seem that a rational distinction can be made between the two-tier administrative process involved in <u>Dantran</u> and in this case and the single-level administrative agency decision reviewed in <u>Florida Power & Light</u>. In the former situation a rejection of the second-tier reversal of the first-tier decision might reasonably be viewed as causing that first-tier decision to be treated as the agency's proper decision, thus obviating the need for a remand as the panel did in <u>Dantran</u>. By contrast, a judicial rejection of an agency's unitary decision with nothing left to take its place leads to the concerns expressed in <u>Florida Power & Light</u>. After all, in this instance the ARB's rejection of the ALJ's determination rested on the impermissible substitution of its own credibility determinations for those of the ALJ, which were firmly grounded in the evidence--and that same path will not be open on remand. But because it may be that "[t]he better part of valour is discretion" (William Shakespeare, <u>King Henry IV</u>, <u>Part I</u>, act 5, sc. 4, line 120), and more importantly because a remand is in order in any event for the reason set out in n.15, the course just stated in the text will be followed.

[15] Moser's Complaint Count II also seeks, as further relief, a writ of mandamus under 28 U.S.C. §1361 ordering the release to it of funds that are being withheld by the United States Postal Service in accordance with Section 352(a). But Moser's submissions devote no substantive discussion to that subject--it is mentioned only in a single sentence asking for that relief at the very end of Moser's opening memorandum (Mem. 24) and in a generalized request in its responsive memorandum (R. Mem. 15) for the relief sought in the Complaint. For defendants' part, they say nothing at all on the matter (hardly surprising, for their position is that the ARB should be upheld). Accordingly that aspect of Moser's prayer for relief is denied, but Department will be expected to deal with it appropriately on the remand that has been ordered here.